Department of Natural Resources v. Waide. Counsel? Good morning, Your Honors. May it please the Court, Counsel. My name is Edie Horne. I'm here on behalf of a number of defendants. Collectively, we've been calling them the Warren-Hammer heirs. What has happened in this case, the short background is a woman named Edith Warren-Hammer who owned Surreal Estate together with a three quarters interest in the oil and gas below that. Before her death, she had executed an option contract with the state. The state accepted the option, or she accepted the option rather, but she passed away before the transaction could be completed. Her executor then went to the court, asked permission to complete the contract that she had entered into, and in 1960, Edith was executed by the executor transferring the real estate and her three quarters interest in the oil and gas. And at the end of the legal description of the property, which is the issue that we have in this case, was the language, accept an undivided one quarter of the oil and gas. And that is the problem that we have here today, is what does that exception contained at the end actually mean? What the state has urged the court to find and what the lower court found is that that was essentially just a notation reflecting a quarter of the interest that had previously been conveyed. However, in interpreting and reading the language of the actual conveyance itself, we believe that it has to be held to be a reservation of that one quarter interest. And it's been treated as a reservation of that one quarter interest from the time that the deed was executed in 1960 up until the state initiated this action in 2008. One of the biggest problems that we have with this type of property is that oil and gas fluctuates, sometimes pretty wildly. And during a time period where there's no production on an oil and gas interest, there are no taxes. There's essentially nothing happening with the property. And that is exactly what took place with this property. It wasn't until about 2000-2001 that anyone noticed there may be some type of worth in exploring that ground. In 2000 and 2001, the defendants, the individuals that I represent, executed oil and gas leases and the exploitation began. Since that time, it's turned out to be a pretty valuable resource. In the time period that this case has been proceeding, the amount that has grown in the suspense account is, I believe, approximately $1.4 to $1.5 million or more. That was at the last we had checked the value. Now, what my clients are asking, what the defendants are asking, is that the state's action to come in and try and recover this ground, this mineral interest, be barred by laches. What has happened here is in this 48 years, no action was taken. The state, at all times, held this deed in their possession and, through lack of diligence, failed to notice the exception at the end of it. Now, the state has argued that it takes exceptional, extraordinary circumstances to apply laches to the state and, in most cases, that is correct. But that happens when the state is acting in their governmental capacity versus their proprietary capacity. And what we have here, in this instance, is the state acting in a proprietary capacity as the owner of this interest. When that happens, the state does not get special treatment beyond what any other individual would receive. And in this case, I don't think there's any question that if you or I or any other individual had owned or claimed that we thought we owned a piece of property but waited 48 years to take any kind of action on that, that we would not be entitled to relief from the court. And that's what the case law says. Pyle, one of the Supreme Court cases, specifically holds that it's not what you actually did know about the property. It's what you should have known or what you could have known had you used the resources that were available to you. In this case, the deed was of record. The tax statements were of record. The leases are public record. Anyone, at any point in time, could have found out that the warreners believed they had an interest in this real estate due to the exception. The state, when they accepted the deed from Margaret Shufelt, which was the executor of Edith Warren Hammer's estate, could have read that language. They had the benefit of representation, as we all know, probably not just of one attorney as the Warren Hammer heirs would have had, but a multitude of sophisticated attorneys in an entire department whose entire function is the management of land and assets such as this. The other important portion of this Lashey's argument is the fact that the state had no interest in this real estate until there was an increase in value. And once that increase in value appeared, all of a sudden, they were now interested in this property that they had believed, according to the state, that they'd owned for 48 years but never bothered to take action with. Other cases have found much, much shorter time periods to be barred by Lashey's when we're dealing with oil and gas simply because of that fluctuating nature. For example, Bays v. Matthews, an 8-year period of time was sufficient to bar a claim under Lashey's. Kyle v. Farrell, we were looking at a 20-year time period. In the Gilet case, 36 years. And in combination with the Gilet case, all but one of the witnesses or parties to the transaction had passed away. The property had also increased in value, and the court found in those circumstances that they were not able to render substantial justice by trying to change the ownership by granting the claim. The Dempster case also made a similar ruling. And, Your Honors, we are faced with the same problem here. No one to this transaction, no party, no individual involved, including the attorney who drafted the deed, is alive today to come in and tell us what the intention of the parties was, what happened, what the circumstances were. Didn't your clients admit in the request to admit that the contract was for the sale and purchase of the real estate and oil and gas? Yes, but in the contract, it contained the description, which contains the language of the issue. And the problem, if this case is allowed to overturn the deed that was given or to reinterpret the deed that was given, to hold that this exception at the end of the description really didn't mean that it was an exception or a reservation, but it was just a notation, is that every land transaction on the records in the state suddenly becomes a jeopardy. It's all of a sudden subject to a second look, to someone's reinterpretation, as opposed to following the construction rules that hold that we need to look at the four corners of the document unless it's ambiguous. And there's really nothing ambiguous about the words except in a one-quarter interest. Do you think that your client's answer in the request to admit is contradictory to your argument? I don't, Your Honor. The document says what it says, but part of what the document says is that it accepts this interest. My clients didn't take any action until there was someone ready to explore the ground, but then they didn't. And the state waited another seven years after that. The state waited another seven years after that to do what? To bring their claim. It wasn't until this ground, until this mineral interest, was very clearly worth a substantial sum of money that the state had any interest. All of this information was at all points in time in the possession of this state. They had the deed. They themselves were involved in the production with regard to the land under Forbes Lake, which is where this is. There's absolutely no reason that the state shouldn't have been aware of this sooner had they just looked at the information available to them. They simply waited until they thought it was worth enough money to them to decide to step in. Did your clients take any possession of this property or attempt any possession or control, I should say? Well, they executed the leases. So, yes, I do believe that they did. And when there was production and they were taxed on it, they paid the taxes. And how long did they do that before the state came in? The leases were executed in 2000 to 2001. The state's claim was filed in 2008. The problem with executing any kind of possession or controlling a case such as this is that you can't really possess a mineral interest under the ground under a lease. And so it's not as though with a land, a boundary line dispute or something, they could go out and put a fence up or declare it to be theirs. They're stuck with, you know, when a lease can be executed, executing a lease, and when they're taxed with paying the taxes. And they did that. They did everything they possibly could have done in terms of exercising any kind of control. So is it your position the state was put on notice when the taxes were paid or would the state have been put on notice when the leases were signed? I think arguably they were on notice with each. Which was the earlier, though, the lease? The earlier would have been the leases. And do these leases have to be filed with DNR or is there any approval that's required by the state? I don't believe of the leases themselves, but with regard to the special unit permits and the unitization permits, those did go through the state. There were petitions on that in 2000 and 2001. There were later unitization petitions in 2005 and 2006. All of those were in front of the state. The state participated not only as a landowner. The state was the hearing officer and an active participant therein. And one of the arguments that the state has made, Your Honors, is that there wasn't enough information involved or they weren't required to make a strong enough finding that should bar them from coming back and relitigating the issue of ownership. However, the state is also the only entity in control of what information is required at those hearings. And if the state itself does not believe that it has sufficient information in those hearings, the state is the only entity to change that. So essentially, the state hides behind itself, I guess, for lack of a better word, with regard to the requirements of notice, with regard to the requirements of the unitization and special drilling permit hearings. And also, they try to hide behind an increased burden by virtue of being the state, and that simply does not apply here, Your Honors. What my clients are asking this court to do is to reverse the finding of the lower court with regard to the laches affirmative defense that they've put forward. And find that the state has waited too long to step forward and assert this claim, which only came out once they realized that there was a significant value here. I understand your questions. Thank you. Thank you, Your Honor. What I'd like to do first is to detail a few more facts about the deed and what occurred before the deed was executed to complete the court's understanding of the circumstances surrounding the execution of the 1960 deed. In 1958, Edith Warren Hammer owned the real estate and three-fourths of the oil and gas underneath the real estate. She entered into an option contract with the department for them to purchase her interest. The defendants have admitted that Edith agreed to sell and the department agreed to buy the real estate and a three-fourths interest in the oil and gas. That contract contained a handwritten notation. It said, one-fourth royalty sold. Just a notation. It did not say one-fourth royalty reserved. It said one-fourth royalty sold because many years previously, when the land was actually owned by Edith's husband, she and her husband conveyed away that one-fourth interest that the notation was referring to. They had conveyed it to a company called Pawnee Royalty Company and then subsequently the partners of Pawnee Royalty Company, two twin brothers, divided that one-fourth between them. Then, after the option contract was executed, the department did exercise its option prior to Edith's death. But unfortunately, Edith passed away before she was able to execute the warranty deed that was required once the state exercised its option. After Edith's death, her executor petitioned the probate court to allow her to complete Edith's contract. Specifically in that petition, she asked permission to convey by an executor's deed all of Edith's right, title, and interest in the property. All of Edith's right, title, and interest was the real estate and a three-fourths interest in the oil and gas. The probate court, there was notice to all the gatees, the devisees, all the heirs. Nobody raised an objection to this request. The probate court entered the order and directed the executor to supply and execute a sufficient deed to convey Edith's title to the department. Now, it was the executor's attorney that prepared the deed. And as has been noted, there included language at the end that appears to be an exception that cuts the department's interest down from a three-fourths interest in the oil and gas down to a one-half interest in the oil and gas. We asked in count one of our complaints that this deed be reformed to omit that particular provision, the one, except one-fourth oil and gas, claiming it was a mutual mistake that that provision even appeared in the deed. How do we determine a mutual mistake when there's nobody to testify that what is meant by except an undivided one-fourth of the oil and gas? How do we do that? I think that in this situation, your honor, that we have court proceedings and court pleadings. There are documents that say except. Again, what we have is we know what Edith owned, and nobody disputes what Edith owned. And nobody disputes that the department wanted to purchase and she wanted to sell to the department everything that she owned. And we have the executor's request to the court, allow me to sell all of Edith's right title and interest. And we have a court order that says you shall do what you ask. You shall sell. You shall execute a deed of all of Edith's. So you can't change your mind and say except an undivided one-fourth interest? Well, where would that come from? In this situation, we have no idea where would that come from. Actually, what the defendants have indicated in their brief that we need to know what the executor's intent was. And that because the language of the deed was unambiguous, she must have intended to reserve a one-fourth interest for the estate. But the key is not the executor's intent. The key is Edith's intent in selling and the department's intent in purchasing and the court's intent based on the request of the executor. What we argue is you shouldn't look at the executor's intent. And if it were her intent to reserve a one-fourth interest, then she disobeyed the court order that she requested. She conveyed less than the state paid for and less than Edith intended for the state to receive. Which, I apologize for saying this, but she essentially committed a fraud against the state then. And the estate, Edith's estate then benefited from a windfall Edith didn't intend for them to receive once the option was exercised. So what we're saying is it was a mistake and that there is evidence of conduct after the execution of the deed that indicates neither the department nor the executor thought that a one-fourth interest was actually reserved by that deed. The evidence from the department is less than a year later, they went and they amended a petition they had to condemn property to create the Stephen A. Forbes State Park. And they added this property because they needed to acquire that one-fourth interest that had previously been conveyed to the Pawnee Royalty Company and divided between the Gwynn brothers. That petition specifically said, you know, we, the state, the department, already own the surface and we already own a three-fourths interest. And each one of the Gwynns own a one-eighth interest. So in that condemnation, they were trying to get the last one-fourth interest from the Gwynns who received it from Edith and her husband. As well as what the department did, the executor didn't do anything inconsistent with having conveyed away all of Edith's interest. She didn't have any other deeds to any other people for this one-fourth interest reserve. She didn't have a release of estate for this one-fourth interest reserve. She acted consistently in filing her final settlement report by not even mentioning any one-fourth interest for this oil and gas. So what you're saying is the executor could only do what she was empowered to do by the court and all of the court documents say three-quarters interest. They either say it or it's understood because they were talking about Edith's interest and Edith's interest was a three-fourths interest. So I won't go so far as to say every court document said three-fourths interest. That's all she had at the time of her death. That's all she had. So they were saying her interest, it had to mean a three-fourths interest. Where would this reservation have come from? Why would there have been a reservation? Now, Ms. Horn says everybody treated this as a reservation of one-fourth ever after the 1960 deed was executed. Well, as I just laid out, the department didn't treat it as a reservation. The executor didn't treat it as a reservation. Nothing occurred actually in the 40 years after the deed was executed. There was no leases by the defendants. There were no taxes paid. What about the 2000-2001 leases? Our contention is, yes, they did exist, but after 40 years of thinking that they owned the property, that they had acquired 100 percent of the oil and gas, does the state have the burden of continually checking the records to see if anybody recorded a lease? Well, was the state involved? Or, not the question, isn't it true the state was involved in these hearings? The permits had to be obtained. It's true the state was involved in these hearings. But Ms. Horn said that the state was the only entity in control of the information at these hearings. That is not correct. The entity in large part control of most of the information at these kinds of hearings is, in fact, the entity that wants to produce the oil. In this case, it was Debron. Does the Department of Natural Resources in Illinois have to be involved in the granting of permits and leases and approvals and things of that nature? We do not have to approve leases that the individual defendants in this case had executed. We do have to give permits for the oil wells. So DNR would have had to have given the permit for the well on their very land. Okay. See, I'm having trouble with the latches, even if we assume that there was a mistake. And I'm just going to say this as a technical. We granted, the department did grant a permit for an oil well to come off. It's actually outside of the state park, and it comes at a diagonal, and it does get oil that's under the land in the state park. The oil that you're claiming is owned by the state? Yes. So you would have gotten, you would have had to issue that permit. Not you personally, but DNR. Yes. Yes, that's true. But that's not what the defendants are pointing to. What the defendants are pointing to is that the department, just from these hearings, the hearings in 2001 to have two special drilling units, and the hearing in 2005 for a unitization, a hearing in 2006 for a unitization, that the information that was submitted to the department for those hearings should have put the department on notice that the defendants owned the one-fourth interest. And what we laid out in our brief and, sure, excruciating detail to your honors, is that that information that was provided by Deep Rock was so lacking in specifics that each unit involved multiple parcels. They involved multiple individuals and entities that were just collectively said, these are the owners of all of the tracts in these units that we're talking about. There was no designation, this tract we're saying belongs to A, B, and C. This tract, D, E, and F. And so there was no way for the department to be on notice that somebody thought they did not own that one-fourth interest from Edith's land. Edith's land totals 70 acres. The special drilling units from the 2000-2001 was 545 or so acres. And so it was just a small part of it. And so it's, again, without the specificity, how could the department know somebody else was claiming the department did not own the one-fourth interest they felt confident they had acquired as part of the three-fourths interest they had acquired from Edith and the one-fourth interest they had condemned so that they would have all of it? I still have a problem. Take me back because I thought the executor was claiming that the ownership of this interest has been decided in hearings before the Department of National Resources. Okay, so you're thinking the executor back in 1960? I'm just talking to the executor as the party here. I'm saying that the ownership interest in this property has been decided at hearings before DNR and DNR participated. And it's not the executor who's making that claim. It's the individual defendants who are heirs of Edith Warren. Sure. And they are making that claim that the ownership interest was decided, but they're making that claim based on findings in the hearing orders that say, you know, these parcels and, again, they don't divide all the parcels and say, you know, this quarter, quarter, this quarter, quarter, this quarter, quarter, this quarter, quarter. That's the land covered by the drilling unit that this hearing order applies to. And then it just makes the generalized finding the owners are the people identified in Petition A. Petition A was created and filed by Deep Rock. And, again, it just jumbled everybody together. It didn't specify this parcel is, you know, A, B, and C. So you're not saying that administrative decisions have no effect, no res judicata, no collateral estoppel? I'm not saying that. I'm saying in this particular situation that for res judicata, that there is, despite the fact having all the requirements met, there is an ability to say it isn't, however, going to be applied to bar the claim if it would be fundamentally unfair to bar the claim. And what we're arguing is because of that lack of specificity that the department, you know, had every reason to believe that they owned the 100 percent, and they had no reason to know somebody else was claiming the one-fourth interest, that it would be fundamentally unfair to bar the state's claim at this point. Also, one of the policies underlying res judicata and collateral estoppel is to prevent a party from being vexed by multitudes of lawsuits, bearing the cost of multitudes of lawsuits, constantly being dragged into court. That's not the situation here because the defendants have not ever actually litigated the exact question, who owns that one-fourth interest? They haven't litigated it. And it wasn't specifically litigated in the various hearings the department participated in and rendered hearing orders for. One thing I'd sort of like to come back around is Ms. Horne made the argument that I think kind of misunderstood what the trial court did. The trial court did not rule in our favor on our alternative claim of construction, where we had said, you know, construed that exception as nothing more than an indication that the executor didn't want to be warranting title to the one-fourth interest that had been previously conveyed. The judge said, because I'm ruling in favor of the Department on Reformation, I'm not going to address that issue. We did raise this concept in our brief, but really only to address the question, why would the department accept a deed that had this provision in it and think it owned the three-fourths interest? And our argument is it can be explained by the concept of perhaps that's what the intent was, was to show the executor was acknowledging the one-fourth interest had already been conveyed and didn't want to be warranting it because she was getting a warranty deed. Now, here's the thing, too, is the death of all the parties, including the executor, also works against the defendants because we don't know any more than they do why that provision was included in there. But it's often the case in reformation that you're claiming a mistake based on a provision that was not agreed upon being put into the deed. And this is the situation we have here. It's just classic reformation. There's something that wasn't agreed to as part of the deal. Everybody agrees on what the deal was between Edith and the department, and we need to remove this because it's created this misunderstanding. Now, the defendants have argued latches. One of the aspects in latches is that you don't look merely at the amount of time, that you do have to look to see if the party who's claiming latches, have they been prejudiced? And we submit that these defendants did not own the one-fourth interest, and yet they did receive royalties from it, and they have even admitted in documents that it totaled nearly a million dollars that they received. The department has stated we are not going to go back against them and try to recover those royalties that they were paid. And the lower court put in its order that we could not go back because we made the representation we would not go back. They say they paid taxes when they started receiving the royalties, but they never say that the taxes totaled more than the royalties that they received. And so our position is because they didn't own the one-fourth interest, they were not entitled to the royalties, and it's not an actual prejudice to them to not receive the royalties in the future. And is it correct that the state is not seeking any past payments? Your Honor, may I answer your question? Yes. Okay. Your question was, is it correct that the state will not go after and seek past payments? That is absolutely correct. We will not, and now under the trial court's order, we cannot. Thank you. Counsel. Thank you. One of the main things that kept recurring during Ms. Small's argument is that we don't know what happened back then, and that is exactly the point that we are trying to make to this court under the affirmative defense of laches. We have no idea why any of this played out the way that it did, but what we do know is what the document itself says, and the document itself says that it accepts this undivided one-quarter interest in the oil and gas. Now, had the state read the document that was handed to them, that 1960 warranty deed, and had any kind of issue whatsoever with the inclusion of that language, they had every opportunity to avail themselves of the remedies of the court at that time. If that deed did not convey to them the property that they felt it should have, the onus is on them to, at that point, correct it, and they made no effort to do so for a period of over 40 years. The defendants had no reason, just as the state claims they had no reason, the defendants had no reason to think that the state was going to, at some point in time, 48 years down the road, claim ownership of something that they had always believed was theirs. This isn't something that a lawsuit had been initiated on, and when their family members passed away and this interest moved on to them, it came with any kind of notice whatsoever. Everyone was blindsided by this. As far as the argument raised by the state, that there was no indication in the closing documents of the State of Edith Warren Hammer that this real estate interest or this mineral interest had been released from the estate or listed in the final settlement, if your honors take a look at that document, which was included as one of the exhibits to the state's motion for summary judgment, there's no real estate whatsoever listed in there. It's not as though everything but this piece was listed. None of the real estate that Edith Warren Hammer owned would appear to have been dealt with in the resolution of the estate. As far as the information that was before the state during these unitization hearings and in any request for a permit, it is the state that controls the flow of information. If DPROC had not presented enough information to the state for the state to feel that they could make an educated finding with regard to ownership, then the onus, again, is on the state to require more information. They control the hearing. They control the proceedings. They control what is required to be placed in front of them. As far as the idea that the defendants have not suffered any kind of damage or any injury by the state bringing this case simply because they did receive royalties prior to the case, that is somewhat misleading. There are 26 identified individuals that our firm alone has represented, and we did not represent every one of the defendants. The interest that some of these folks had is very small. The interest that others had is larger. To just put out there that there's a million dollars paid out to them makes it seem as though this is some huge windfall for an individual, which is not the case. However, this is something that they've held ownership of. This is something that they have discussed within their families. This is something that they expect to be able to pass on to future generations. And the loss of that is the same as the loss of any other property right that would be taken from them. It doesn't change. It doesn't make the injury to them any less, simply because they've received something in the past. In fact, I think it makes it an even greater injury to them. The biggest problem with regard to the State's claim is simply that so much time has passed that no one can answer any of the questions that any of us have with regard to why the language would have been included or what the intention of any would have been. I'm sure no one knows better than Your Honors that people disregard court orders every day. It happens all the time. We don't know why, but we do know that if the State had felt that that was what happened in this case with the 1960 warranty deed, they had every opportunity in the availability of the court to go back and have that remedied at the time, yet they failed to do so until this interest gained a significant increase in value. Then they started paying attention. So, Your Honor, what we're asking is that their claim be barred by laches and that my clients be allowed to continue in their ownership. Thank you.